IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 23, 2025 Session

## STATE OF TENNESSEE v. MARK KETRON

**Appeal from the Criminal Court for Sullivan County**
**No. S75480   William K. Rogers, Judge**

_____

## No. E2024-00487-CCA-R3-CD

_____

Following the denial of a motion to suppress, the defendant, Mark Ketron, pled guilty to driving under the influence ("DUI"), DUI per se, and violation of the light law, for which he was sentenced to an effective term of eleven months and twenty-nine days suspended to probation after service of forty-eight hours in jail.  On appeal, the defendant asserts that, as part of his plea, he reserved the right to appeal the denial of his motion to suppress. Following a thorough review of the record, the briefs, and the oral arguments of the parties, we conclude the defendant failed to properly certify a question of law pursuant to Rule 37(b)(2) of the Tennessee Rules of Criminal Procedure.  Accordingly, this Court is without jurisdiction, and the appeal is dismissed.

### Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed

J. ROSS DYER, J., delivered the opinion of the court, in which JILL BARTEE AYERS and MATTHEW J. WILSON, JJ., joined.

Joseph W. McMurray, Kingsport, Tennessee, for the appellant, Mark Ketron.

Jonathan Skrmetti, Attorney General and Reporter; Courtney N. Orr, Deputy Attorney General (at oral argument); Garrett D. Ward, Senior Assistant Attorney General; Barry P. Staubus, District Attorney General; and Louis D. Torch, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

In July 2022, the defendant was charged by presentment with DUI, DUI per se, and violation of the light law.  Before the case could proceed to trial, the defendant filed a

motion to suppress evidence obtained during the stop of his car at a sobriety checkpoint as violative of his right to be free from unreasonable searches and seizures.

The trial court conducted a hearing on the motion on November 17, 2023, at which Corporal Matt McGuire with the Kingsport Police Department ("KPD") testified that the KPD set up sobriety checkpoints once per quarter in accordance with its grant from the Tennessee Highway Safety Office. The primary purpose of the checkpoint was to look for intoxicated drivers, and officers only pulled over vehicles where there was an obvious violation of the law and only administered field sobriety testing on "persons who smell[ed] of alcohol, or who ha[d] admitted to drinking alcohol, or if [officers] smell[ed] illegal drugs coming from the vehicle."

The KPD had a standard operating procedure for setting up and running sobriety checkpoints, and the patrolmen did not "have any say so on where the checkpoints are, other than just to sign up and work the checkpoint." In accordance with their procedures, the KPD's public information officer issued a press release on December 10, 2020, informing the public that the KPD would be operating a sobriety checkpoint on Friday, December 18, 2020. The release specified that the checkpoint was part of "the ongoing effort to reduce the dangerous problem of driving under the influence" and that it was going to be "held at an undisclosed time and location, within the city limits of Kingsport." Prior to the release being issued, Lieutenant Justin Quillin sent a memorandum to Captain Mike Roark indicating that the checkpoint was to be set up on Fort Henry Drive near Wesley Road because it is "a major thoroughfare within Kingsport," experiences a "high volume of traffic . . . [and] has had several crashes," and has historically "been an area known for a high amount of arrests for driving offenses[.]"

A "sobriety checkpoint checklist" provided the standard procedure for operating a checkpoint. According to Corporal McGuire, sobriety checkpoints were usually set up from 10:00 p.m. to 2:00 a.m., and before the checkpoint began, the officers working it were briefed on the procedure, signed off that they received the training, reviewed the news release, and started the activity sheet. The checklist provided for lights, cones, and signs to be placed on the roadway by 10:30 p.m. All the patrol cars had to have their lights operating for safety purposes. The highest-ranking officer on site would serve as the site safety officer, while the other officers would count cars, check for violations, and write tickets. They would also have one vehicle set up as a chase car. The officers working the checkpoint were informed of the violations most frequently observed during sobriety checkpoints, including "light law, high beams, seat belt, expired tags." Officers were instructed to begin breaking down the checkpoint at 1:30 a.m. Corporal McGuire said that they normally tried to "stop the checkpoints" between 1:00 and 1:30 to give officers time to gather equipment and finish paperwork before the end of the shift.

- 2 -

Lieutenant Kevin Hite was the officer in charge of the December 18 checkpoint, and a total of ten officers, including Lieutenant Hite, worked the checkpoint and received training beforehand. According to Corporal McGuire, all the officers on the scene "followed the operating procedures as sort forth by [Lieutenant] Quillen and other officers with the Kingsport Police Department." Corporal McGuire reiterated that he did not unilaterally decide where the sobriety checkpoint would be located or how it would be executed.

Corporal McGuire testified that he stopped the defendant during the checkpoint because one of the defendant's headlights was out. When Corporal McGuire approached the defendant, he noticed that the defendant "had an odor of alcohol coming from his person." Due to the odor of alcohol, Corporal McGuire had the defendant pull off to the side of the road and "attempt field sobriety testing."

On cross-examination, Corporal McGuire explained that the news release regarding the sobriety checkpoint was also published on the KPD's social media sites and local papers could choose to repost the release as well. Corporal McGuire reiterated that Lieutenant Quillen, who selected the location for the checkpoint, did not work the checkpoint that evening. Additionally, Lieutenant Hite, who was the high-ranking officer at the checkpoint, had no input in selecting the location for the checkpoint to Corporal McGuire's knowledge. Corporal McGuire was aware that "supervising officers" sometimes had input in choosing the locations for checkpoints, but he did not know whether that occurred in this case.

In describing how a sobriety checkpoint operated, Corporal McGuire explained that they usually blocked one lane of traffic and funneled all the cars into one lane "because we only have so many bodies to work the checkpoint." As each vehicle pulled up, there was a brief interaction between the officer and driver. "If the officer doesn't indicate or detect any kind of signs of impairment, or any other violations of law, they are then released and set to go freely." The officers stopped every car unless the traffic backed up to a point of creating a safety issue.

With regard to this particular checkpoint, Corporal McGuire noted that "DUI ahead [warning] sign[s]" were placed for both directions of traffic on Fort Henry Drive, but the checkpoint only affected the northbound side of the road. The warning sign was placed 712 feet from the checkpoint on the southbound side and 1260 feet from the checkpoint on the northbound side. The northbound warning side was placed "well before getting onto the bridge itself," just after a "cut-through" where drivers seeing the sign "could actually legally and safely do a U-Turn and go back into Colonial Heights." However, upon further reflection, Corporal McGuire recalled that Fort Henry Drive had a median with a guardrail in that area that would prevent a driver from turning around and going in the other direction.

- 3 -

Additionally, there would have been a chase car positioned facing southbound "in case someone does some kind of other violation, and takes off the other way. They will go and deal with that violation." Corporal McGuire said that the checkpoint ran from "10 pm-2[a]m, that's a four hour block for the checkpoints."

The trial court denied the defendant's motion to suppress. In doing so, the court observed that Corporal McGuire outlined the procedures used at the checkpoint and that "a very detailed outline of the officers that were there" was provided and advance notice was "sent to social media and to the news outlets." The court noted that the notice was ten days, rather than the fourteen days outlined in the KPD's operating procedures but did not find the discrepancy to be enough to merit suppression. In looking at the guidelines from *State v. Downey*, 945 S.W.2d 102 (Tenn. 1997), the court found that the State had "established . . . the public concern in having these sobriety checkpoints under certain strict guidelines" outweighed the minimal impact on "the liberties of driver's coming through this checkpoint[.]"

After the trial court made its oral ruling, defense counsel asked for a "status date" before the scheduled trial date because the defendant might "want to change his plea, and possibly reserve the right to appeal" given the essential nature of the suppression issue. Ten days later, the defendant filed a motion for interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure seeking review of the denial of his motion to suppress. The trial court denied the Rule 9 motion on December 6, 2023.

On that same day, December 6, the defendant entered a plea agreement under which he pled guilty to the DUI counts, which would merge, and violation of the light law. Among the provisions in the plea agreement, above the defendant's signature, is the statement: "I fully understand my right to have my case reviewed by an Appellate Court, but hereby expressly and knowingly waive my right to file a motion for a new trial or otherwise appeal the conviction(s) in my case here today." The trial court entered an order accepting the defendant's plea the day it was submitted. The order, which was signed by the defendant and defense counsel, included the statement:

> [T]he [c]ourt did then interrogate the defendant personally as to all matters previously set out and the [c]ourt did interrogate the defendant as to the intelligent and voluntary waiver of all rights previously set out.
>
> Based upon this personal interrogation the [c]ourt concludes that the defendant understands the nature of the charge(s) against him/her and the rights which he/she is giving up by this plea.

The trial court conducted a sentencing hearing on March 11, 2024, after which it imposed a sentence of eleven months and twenty-nine days with forty-eight hours to serve on the DUI convictions, merged into one conviction, and a thirty-day sentence for the light law violation concurrent with the DUI sentence. Defense counsel averred at the sentencing hearing that the defendant had "preserv[ed] [his] right to appeal" the suppression issue and requested an appeal bond, which the trial court granted. The defendant filed a notice of appeal on April 1, 2024.[1]

*Analysis*

On appeal, the defendant argues that the trial court erred in denying his motion to suppress because the sobriety checkpoint at which he was seized ran afoul of the constitutional guidelines for such checkpoints. Initially, the State responds that the defendant's appeal should be dismissed because he waived his right to appeal by entering a guilty plea and did not properly reserve a certified question of law. We agree with the State.

In a statement of jurisdiction in his brief, the defendant asserts that this appeal "has been taken as a matter of right pursuant to Rule[] 3(b) of the Tennessee Rules of Appellate Procedure and Rule 37(b)(2)(ii) of the Tennessee Rules of Criminal Procedure[.]" The defendant further asserts that the "scope and limits of the legal issue reserved [were] clearly identified and articulated in the Motion to Suppress."

A guilty plea "constitutes an admission of all facts necessary to convict and waives all non-jurisdictional defects and constitutional irregularities which may have existed prior to the entry of the guilty plea." *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). However, Tennessee Rule of Appellate Procedure 3(b)(2) specifies the limited scenarios when a defendant in a criminal case has a right of appeal following a guilty plea:

> [I]f the defendant entered into a plea agreement but explicitly reserved the right to appeal a certified question of law dispositive of the case pursuant to and in compliance with the requirements of Rule 37(b)(2)(A) or (D) of the Tennessee Rules of Criminal Procedure, or if the defendant seeks review of the sentence and there was no plea agreement concerning the sentence, or if the issues presented for review were not waived as a matter of law by the plea of guilty or nolo contendere and if such issues are apparent from the record of the proceedings already had. . . .

---

[1] The appellate record does not contain the judgments, but the defendant's notice of appeal indicates that he is appealing from judgments entered on March 11, 2024, the same day as the sentencing hearing.

Tenn. R. App. P. 3(b)(2).

Tennessee Rule of Criminal Procedure 37(b)(2) provides that a defendant can appeal a certified question following a guilty plea when:

(A) the defendant entered into a plea agreement under 11(c) but explicitly reserved – with the consent of the [S]tate and of the court – the right to appeal a certified question of law that is dispositive of the case, and the following requirements are met:

(i) the judgment of conviction or order reserving the certified question that is filed before the notice of appeal is filed contains a statement of the certified question of law that the defendant reserved for appellate review;

(ii) the question of law as stated in the judgment or order reserving the certified question identified clearly the scope and limits of the legal issue reserved;

(iii) the judgment or order reserving the certified question reflects that the certified question was expressly reserved with the consent of the [S]tate and the trial court; and

(iv) the judgment or order reserving the certified question reflects that the defendant, the [S]tate, and the trial court are of the opinion that the certified question is dispositive of the case[.]

Tenn. R. Crim. P. 37(b)(2)(A)(i)-(iv). In addition to the above requirements, our supreme court instructs:

[T]he question of law must be stated so as to clearly identify the scope and the limits of the legal issue reserved. For example, where questions of law involve the validity of searches and the admissibility of statements and confessions, etc., the reasons relied upon by defendant in the trial court at the suppression hearing must be identified in the statement of the certified question of law and review by the appellate courts will be limited to those passed upon by the trial judge and stated in the certified question, absent a constitutional requirement otherwise.

*State v. Preston*, 759 S.W.2d 647, 650 (Tenn. 1988).  The defendant bears the burden of satisfying the requirements of Rule 37(b)(2).  *State v. Pendergrass*, 937 S.W.2d 834, 837 (Tenn. 1996).

Whether we have jurisdiction in this case is a looming question, the determination of which is hindered because the appellate record does not contain the judgments or the transcript of the plea acceptance hearing.  The defendant obviously believes he reserved a certified question regarding the constitutionality of the checkpoint and denial of his motion to suppress.  However, the defendant has failed to satisfy the requirements for properly certifying a question under Rule 37.

The record must contain the judgment or an order entered by the trial court that "contains a statement of the certified question of law that the defendant reserved for appellate review[,]" and the question must "identif[y] clearly the scope and limits of the legal issue reserved[.]"  Tenn. R. Crim. P. 37(b)(2)(A)(i), (ii).  Although defense counsel referenced "preserving" the suppression issue at the sentencing hearing, the record does not contain a "judgment of conviction or order reserving the certified question" that "contains a statement of the certified question of law."  *See* Tenn. R. Crim. P. 37(b)(2)(A)(i).

As to the scope of the question, the defendant posits in his brief that "the scope and limits of the legal issue reserved [were] clearly identified and articulated in the Motion to Suppress" along with a citation to nine pages in the transcript.  It is not the responsibility of this Court to examine nine pages of testimony and argument to create a succinct certified question for the defendant.  Moreover, it is well-established that the final order or judgment must contain a statement of the dispositive certified question of law stated so as to clearly identify the scope and the limits of the legal issue reserved "[r]egardless of what has appeared in prior petitions, orders, colloquy in open court or otherwise."  *Preston*, 759 S.W.2d at 650; *see, e.g.*, *Pendergrass*, 937 S.W.2d at 836-37.

Further, there is no indication in the record that the State consented to reservation of the question or believed that it was dispositive of the case.  *See* Tenn. R. Crim. P. 37(b)(2)(A)(iii), (iv).  Along the same vein, although the trial court indicated at the sentencing hearing its knowledge that something "is pending on appeal," such statement does not satisfy the requirements of the court consenting to reservation of the question or believing that it was dispositive of the case.  *See id.*

Strict compliance with the prerequisites of Rule 37 is required.  *State v. Armstrong*, 126 S.W.3d 908, 912 (Tenn. 2003).  It is the defendant's "burden of ensuring that the final order complies with the requirements of Rule 37 and that the appellate record is sufficient for review."  *State v. Springer*, 406 S.W.3d 526, 531 (Tenn. 2013); *see Pendergrass*, 937

S.W.2d at 837. The failure to properly reserve a certified question of law pursuant to Rule 37 results in dismissal of the appeal for lack of jurisdiction. *Pendergrass*, 937 S.W.2d at 838.

The defendant has failed to meet the requirements set forth in Rule 37(b)(2) of the Tennessee Rules of Criminal Procedure to properly certify a question of law. Thus, this Court lacks jurisdiction, and the appeal is dismissed.

In his reply brief, the defendant presented a two-fold counterargument in the event this Court determined that dismissal was appropriate. The defendant first asserted that, pursuant to Tennessee Rule of Criminal Procedure 36, "given the fact no final judgment or order has been filed, it would appear [his] guilty plea would be subject to amendment correcting the clerical omission and oversight of the parties not having set forth their agreement in that pleading to proceed with appeal of a certified issue." The defendant overstates the factual situation as it does not appear that a final judgment was not filed,[2] but instead, only that the final judgment was not included in the record on appeal. Moreover, without a transcript of the guilty plea hearing there is nothing in the record to support the defendant's claim of the parties "having set forth their agreement . . . to proceed with appeal of a certified issue."[3] In this context, to use Rule 36 to correct a clerical error would be a veiled attempt to confer jurisdiction where none existed due to noncompliance with Rule 37.[4] *Cf. Pendergrass*, 937 S.W.2d at 837.

In the alternative, the defendant asks that this Court, under Tennessee Rule of Appellate Procedure 2, "suspend[] any rules that would hinder addressing the merits of the issue on appeal so that this matter might be disposed of in the most expeditious manner and brought to its proper conclusion."

As indicated, Tennessee Rules of Appellate Procedure 2 provides that "[f]or good cause, including the interest of expediting decision upon any matter," this Court "may suspend the requirements or provisions of any of these rules[.]" Citing Tennessee Rule of Criminal Procedure 32(f)(1), the defendant intimates that suspending the rules of appellate procedure would "expedite matters" and be the most "economical use of judicial resources" because "a motion to withdraw his [guilty] plea grounded upon 'any fair and just reason'

---

[2] On the notice of appeal, the date of 03/11/2024 is listed on the line above the instruction: "List the date(s) the final judgment(s) was filed in the trial court clerk's office."

[3] We note that the plea petition and order accepting plea of guilty contain no mention of a certified question.

[4] It appears that the trial court could have used Rule 36 to make curative measures to comply with Rule 37 had that been the intent, but it would have had to do so before the notice of appeal was filed, and it lost jurisdiction. *See Armstrong*, 126 S.W.3d at 912.

- 8 -

could appropriately be presented to the trial court."  The defendant is simply incorrect that he could pursue "withdraw[ing] his [guilty] plea upon 'any fair and just reason'" because "fair and just reason" is the standard for such action "[b]efore sentence is imposed," *see* Tenn. R. Crim. P. 32(f)(1), and the sentence has already been imposed in this case. Moreover, an appellate court's discretion under Rule 2 should be utilized "very sparingly, only in extraordinary circumstances." *See Levitt, Hamilton, and Rothstein, LLC v. Asfour*, 587 S.W.3d 1, 11 (Tenn. Ct. App. 2019); *Harbin v. Jones*, No. W2012-01474-COA-R3-CV, 2013 WL 1249050, at *5 (Tenn. Ct. App. Mar. 28, 2013).  Upon our cursory review, the sobriety checkpoint was not conducted in a manner plainly afoul of constitutional principles.  Given all the above considerations, we decline to exercise our discretion to suspend compliance with Tennessee Rule of Appellate Procedure 3(b)(2).

### *Conclusion*

Based on the foregoing authorities and reasoning, we conclude that this Court is without jurisdiction and dismiss the appeal.

s/ **J. ROSS DYER**
J. ROSS DYER, JUDGE